**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT FRANKFORT**

BENNIE L. HART,

      Plaintiff,

v.

GREG THOMAS, in his official capacity as
Secretary of the Kentucky Transportation
Cabinet,

      Defendant.

Case No. 3:16cv00092-GFVT

***Electronically Filed***

**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

## Table of Contents

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 1

   I.   Overview of Kentucky's Personalized License Plate Program ........................................ 1

   II.   The Ongoing Evolution of the Personalized License Plate Review Process ..................... 2

   III.   Kentucky's Inconsistent Approval of Personalized License Plates ................................... 4

   IV.  Mr. Hart's Request ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 7

   I.   Kentucky's Personalized License Plate Program Violates the First Amendment Because it Censors Speech Based on Viewpoint. ............................................................................. 7

      A.   Personalized license plates communicate private, not government, speech. ............ 7

          i.   Personalized license plates have historically been used to communicate private speech. ..................................................................................................... 8

          ii.  Personalized letter and number combinations are closely identified with individuals, not the state. .................................................................................. 9

          iii.  Vehicle owners largely control the messages on personalized plates, not the state. ................................................................................................................ 10

          iv.  Most courts view personalized plates as private speech. ..................................... 11

      B.   Personalized license plates are subject to First Amendment scrutiny. ................... 12

      C.   KRS 186.164 contains unreasonable impermissible viewpoint restrictions. ........... 13

          i.   A categorical ban on religious and political speech constitutes viewpoint discrimination. ................................................................................................. 13

              1.   Kentucky's plate restriction on the basis that an individual seeks to promote "any specific faith, religion, or antireligion" is accordingly unconstitutional. 14

              2.   Kentucky's restriction on the basis that an individual seeks to "promote a specific political belief" is unconstitutional. ............................................... 16

          ii.  Kentucky's restriction on religious and political speech is unreasonable. ........... 17

              1.   Kentucky's interpretation of the governing statutes is unreasonable because it does not support its stated purposes for the policy. ................................ 18

              2.   Kentucky's interpretation of the governing statute is unreasonable because there is no articulated basis for the interpretation, and as such, it is inconsistently enforced. ................................................................................ 19

      D.   On its face, the "good taste and decency" regulation violates free speech because it is overbroad and confers unbridled discretion. ...................................................... 20

   II.   Kentucky's Denial of Mr. Hart's License Plate is also an Unconstitutional Application of the Regulation and the Statute. ....................................................................................... 22

i

A.   Rejection under 601 KAR 9:012(5) discriminates based on viewpoint. ................. 22

B.   Kentucky's application of KRS 186.164(9) also discriminated based on Plaintiff's viewpoint.................................................................................................................... 23

C.   Kentucky's purported reasons for denying Mr. Hart's plate are pretextual and unreasonable. ...................................................................................................... 24

CONCLUSION.................................................................................................................... 25

## INTRODUCTION

Personalized license plates represent vehicle owners' unique personal values, beliefs, and messages. Kentuckians historically request personalized plates that reflect their views. This case is about one Kentuckian's desire to have his protected speech on a personalized license plate, and the state's denial of that request. Kentucky's governing statutes and regulation are, on their face, an unconstitutional restriction of speech, and Kentucky's application of these laws to Mr. Bennie Hart similarly violates the First Amendment. No dispute of facts exists, and Plaintiff Hart is entitled to summary judgment in his favor.

## STATEMENT OF FACTS

### I.  <u>Overview of Kentucky's Personalized License Plate Program</u>

All motor vehicles registered in the state of Kentucky are issued a license plate by the Kentucky Transportation Cabinet ("KYTC"). KRS 186.005. Standard Kentucky license plates contain a randomly-generated combination of three letters and three numbers. KRS 186.005(2). In Kentucky, as in most states, a motorist may also request a personalized plate. A personalized license plate is "a license plate with personal letters or numbers significant to the applicant." KRS 186.174(1). There are over 40,000 personalized plates on the roads in Kentucky. Ex. 1, Snyder Dep. 150:8-11.[1] Each of these personalized license plates is unique, and a personalized alphanumeric combination may only appear on one plate in Kentucky at a time. KRS 186.174(5)(a). There is no limit to the number of personalized plates that are allowed to be on Kentucky roads at any given time. Ex. 2, Onodu Dep. 95:9–12. The personalized license plate program is governed by KRS 186.174, KRS 186.164, and 601 KAR 9:012, the first of which was

---

[1] For the Court's convenience, an index of all exhibits referenced is attached as Exhibit 45.

passed in 1976.[2]

The personalized license plate program is optional, and "[a]ny owner of a noncommercial motor vehicle required to be registered for use on Kentucky Highways" is eligible for the program.[3] Motor vehicle owners or lessees may "decide that they would want to have their name or message on the back of their plate." Ex. 3, Taylor Dep. 16:5–13. The specific alphanumeric combination on a personalized plate is created solely by the individual who owns the registered vehicle in the state of Kentucky. Ex. 2, 94:12–19. The alphanumeric combination has significance to the applicant, KRS 186.174(1), and may contain references to such topics as their names, initials, interests, jobs, anniversaries, birthdates, favorite sports team, among countless other subjects. *See, e.g.*, Ex. 1, 157:1–11.

## II. <u>The Ongoing Evolution of the Personalized License Plate Review Process</u>

Before November 2016, when this lawsuit was filed, requests for personalized plates were reviewed, and either approved or denied, by two KYTC Division of Motor Vehicle Licensing ("MVL") employees. *See, e.g.*, Ex. 2, 16:24–17:7. Personalized plate requests were first submitted to the county clerks, who reviewed them for statutory and regulatory compliance. Ex. 4, Hack Dep. 43:21–49:18. Once the county clerk accepted the request, it was submitted to KYTC, where the two employees reviewed it. Ex. 1, 29:16–23. Aside from the occasional involvement of a supervisor, these two individuals unilaterally decided whether to approve or deny a plate. *Id*. 30:6–16; Ex. 5, Henderson Dep. 16:5–27:5.[4]

---

[2] The relevant statutes have undergone several changes since this litigation began. The most recent change, which has not yet taken effect, will replace a reference in KRS 186.174 to KRS 186.164(9)(c)–(g) with a near word-for-word recitation of its text. KRS 186.174(b)(1–5)(2019). None of these changes have been substantive. Ex. 5, 197:8–200:12. For consistency, all references are to the current version of the statutes, as of April 15, 2019.

[3] https://secure.kentucky.gov/kytc/plates/web/LicensePlate/Index/030af448-0201-471d-b561-d68376752ef6#plateAnchor (last accessed April 15, 2019).

[4] Unless indicated otherwise, Commissioner Henderson's testimony was provided as the Rule 30(b)(6) designee for Defendant. Ex. 5, 5:21–6:18.

In the wake of this lawsuit, KYTC amended its review procedure. Specifically, in January of 2017, KYTC instituted a "hierarchical" review process involving "[three] levels of management to ensure compliance" with the relevant statues. Ex. 6, 01/26/17 Williams Email. The three management-level MVL employees involved in this process were Branch Manager Ainsley Snyder, Assistant Director Godwin Onodu, and Director Stephanie Williams, with Ms. Snyder conducting the initial review of the plates. Ex. 1, 45:14–46:22. At some point in "early 2017," KYTC began to require an explanation of the requested plate text on the application. *Id.* 157:19–158:5.

Under the leadership of then-Commissioner John-Mark Hack, in April 2017 a moratorium was placed on the personalized plate program to "allow for a comprehensive review of current processes and procedures" and "ensure that relevant statutes and regulations are consistently followed." Ex. 7, 04/14/17 Hack Memo. This moratorium was lifted effective July 17, 2017. Ex. 8, 07/14/17 Hack Email. Beginning that month, personalized plate requests were reviewed by a five-member panel consisting of a "diverse group of individuals." Ex. 5, 45:4–11; 90:16–92:2 (discussing generally the diverse makeup of the review committee). Those five individuals were provided with a compiled spreadsheet of personalized plate requests, including the customer's provided meaning, and were to vote to approve or deny those requests. Ex. 9, Noel Dep. 23:21–24:5. The panel members' votes were then tallied to determine whether the plate would be approved or denied; a simple majority of panel members' votes was needed to approve a plate. Ex. 10, Panel Review Flowchart. The panel members were instructed to deny any personalized license plate that contained any religious or political reference. Ex. 5, 51:7–23; *see also* Ex. 11, 09/19/17 Noel Email.

The committee review continued until approximately the summer of 2018, at which time it abruptly stopped, and KYTC's Commissioner, Matt Henderson, assumed unilateral review of the personalized license plate requests, "to [his] chagrin." Ex. 5, 56:8–19. This change occurred as a result of public backlash to KYTC's decision, under the committee review process, to recall a personalized license plate with the alphanumeric combination "PRAY4," which the committee believed was a religious reference. *Id*. 54:17–57:21. KYTC heard from many members of the public who were upset that the plate was recalled, and many of these citizens expressed the opinion that this was not a religious statement. *Id.* In light of this, KYTC chose to "move towards a process with a little bit more nuanced understanding of the statutes," rather than the "very strict interpretation" of the statutes applied during the committee review process. *Id*. 55:25–56:2; 51:15-16. Commissioner Henderson now reviews personalized plate requests with the occasional collaboration of other Executive Branch attorneys, including those in Governor Matt Bevin's office. *Id.* 58:11-60:14. He applies a more "nuanced" approach to determining whether religious or political references will be approved. *Id*. 64:8–65:12.

### III. Kentucky's Inconsistent Approval of Personalized License Plates

Although neither of the governing statutes has substantively changed what is permitted or prohibited on personalized plates, KYTC's practice with respect to plates containing religious or political references has varied. Before this lawsuit began, KYTC allowed many of these plates. *See, e.g.,* Ex.1, 172:15–21; Ex. 4, 37:23–39:3; *see also* Ex. 12 (list of over one hundred current personalized license plates with the letters G-O-D in that order, including "MYGOD," "LETGOD," "1GOD," and "GODCAN").

After, and partly in response to, the initiation of this lawsuit, KYTC employees responsible for reviewing plate requests were instructed to deny any plate requests that included

any religious or political reference, including if the reference was only based on the explanation provided by the customer. *See, e.g.,* Ex. 11 (email from Angela Noel to review panel stating, "[r]emember, if the customer sites [sic] anything religious in the explanation we aren't supposed to approve the plate"); Ex. 1, 129:12–130:19 (confirming Ms. Noel's statement was consistent with Ms. Snyder's understanding of the policy). In at least one instance, a previously-approved plate was recalled when the customer confessed that the plate had a religious reference, which she purposefully omitted from her plate application. Ex. 13, 06/21/18 Noel Email.

Currently, KYTC applies a more "nuanced" reading of the governing statutes, allowing for some religious and political plates and not others. Under the current application, plates with the phrases "SRVGOD" and "THXGOD" were approved, although "IM GOD" would still be denied. Ex. 5, 107:7–13; Ex. 14, 07/20/18 Noel Email; Ex. 5, 155:22–157:18. The decision about what religious plates will be approved or denied is not straightforward. *See, e.g., id.* 107:14–108:23 (explaining that whether the religious reference was to a triune god or one specific god may affect a plate request); *see also* Ex. 15 (chart demonstrating the inconsistencies of how KYTC applied statute to plates with religious reference over time.). Under this application of the statute, a plate requesting "EQUAL-T," with the explanation that the customer wants to celebrate equality, was denied as being a political reference. Ex. 16, 12/17-31/18 Plate Spreadsheet at 7.

At no time during the evolution of the review process were employees given written guidance or training materials to direct their review. KYTC employees were provided copies of the relevant statutes, and little else. Ex. 1, 123:21–124:2; Ex. 2, 64:11–66:10.

### IV. Mr. Hart's Request

In 2016, Bennie Hart ("Plaintiff" or "Mr. Hart"), a Postal Service retiree, and his wife of over sixty years moved from Ohio to Independence, Kentucky. Ex. 17, Hart Dep. 19:3–24; 23:2–

4. As a resident of Ohio, Mr. Hart, an atheist, requested and received a personalized license plate with the phrase "IM GOD" for his car, and retained that Ohio plate for approximately 12 years until moving to Kentucky. *Id*. 22:15–23:1. Mr. Hart initially requested this plate text in Ohio because he "thought it was interesting, and…it was a conversation." *Id.* 23:19–24:2. Upon moving to Kentucky, Mr. Hart requested the same personalized message for his car; he desires this message on his plate because it is his way of spreading a political and philosophical message that faith is susceptible to individualized determination. [DN #1, ¶1].

Mr. Hart's request was initially approved. Ex. 18, 03/09/16 Snyder Email at 2. The county clerk responsible for dispersing the plate to Mr. Hart, however, contacted KYTC expressing concerns about the plate's "appropriate[ness]" and asking that the state "not print it." *Id*. This sparked an internal discussion among KYTC employees, and ultimately the decision was made to deny Mr. Hart's request. Ex. 19, 03/16/16 Snyder Email. Mr. Hart received a letter dated March 11, 2016, stating that his plate request was denied "because it does not meet the requirements of KRS 186.174 and 601 KAR 9:012. Section 5. These laws dictate that a personalized plate may not be vulgar or obscene." Ex. 20. Mr. Hart contacted KYTC regarding the denial of his plate, and expressed to Branch Manager Ainsley Snyder that he simply wanted to create conversation and encourage people to ask questions. Ex. 1, 181:11-184:22. Ms. Snyder informed Mr. Hart that his plate was denied because it was "in bad taste." *Id*. Following this phone call, counsel for Mr. Hart wrote a letter to KYTC asking for reversal of its decision about Mr. Hart's requested plate. KYTC officials responded in writing and stated that "the plate was not rejected because of vulgarity or obscenity…the use of 'IM GOD' is not in good taste and would create the potential of distraction to other drivers and possibly confrontations." Ex. 21, 03/28/16 Letter to Counsel. The instant lawsuit followed. Under either the committee review

process or the current Commissioner review process, Mr. Hart's plate would be denied. Ex. 5, 131:11–23; 155:22–157:18. Mr. Hart continues to desire a personalized license plate with the personal religious and political message "IM GOD;" he is a registered Kentucky motorist who owns a vehicle, and is therefore eligible to apply for one. [DN #1, ¶24].

## ARGUMENT[5]

## STANDARD OF REVIEW

Summary judgment must be granted if the movant shows, as to one or more claims, that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986).

I.   **Kentucky's Personalized License Plate Program Violates the First Amendment Because it Censors Speech Based on Viewpoint.**

A.   **Personalized license plates communicate private, not government, speech.**

The Supreme Court has made clear that while the government may choose its own message, the free speech clause applies to private speech. *Matal v. Tam,* 137 S. Ct. 1744 (2017). Courts apply legal scrutiny to governmental restrictions on private speech "in situations in which government-owned property or a government program was capable of accommodating a large number of public speakers without defeating the essential function of the land or the program." *Pleasant Grove City v. Summum*, 555 U.S. 460, 478 (2009).

---

[5] Unless otherwise stated, all internal citations and quotation marks are omitted.

In *Walker v. Texas Division, Sons of Confederate Veterans, Inc.,* the Supreme Court deemed Texas' specialty license plates to be government speech, relying on *Summum*. The Supreme Court described the relevant factors (from *Summum*) as: 1) the historical use of monuments as a means of expression; 2) that property owners generally agree with the messages communicated on their property; 3) the degree of control retained by the city over selecting monuments for inclusion; and 4) "a few other relevant considerations." *Walker*, 135 S.Ct. at 2247.

The *Walker* decision was confined to specialty license plate designs and explicitly excluded personalized license plates such as those that are at issue here. *Id.* at 2244.  Moreover, the Supreme Court recently said that *Walker* "likely marks the outer bounds of the government-speech doctrine," and noted that the government-speech doctrine "is susceptible to dangerous misuse." *Matal,* 137 S. Ct. at 1760, 1758. "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.* at 1765. Under the relevant considerations from *Matal, Walker,* and *Summum,* personalized license plates in Kentucky are private speech.

## i.  <u>Personalized license plates have historically been used to communicate private speech.</u>

In Kentucky, vehicle owners select the messages for their personalized plates. Kentucky law defines "personalized license plate" as a plate "with personal letters or numbers *significant to the applicant*." KRS 186.174(1) (emphasis added). Given the statutory language, the age of the program (KRS 186.174 was first codified in 1976), and the extremely large number of participants (over 40,000), personalized alphanumeric plate combinations in Kentucky have not been historically used to communicate on behalf of the government. Rather, personalized plates traditionally have communicated messages that are significant to drivers.

8

These facts are wholly unlike the historical use described in *Walker*. The *Walker* court focused on the background mottos and graphics which had been used by the government on plates as early as 1917.  *Walker*, 135 S. Ct. at 2248. The specialized license plate designs in *Walker* would be replacing those specific messages.  Conversely, there is no evidence that the randomly selected text on plates, which would be replaced by personalized messages, have ever been used to communicate messages from Kentucky.

ii.   **Personalized letter and number combinations are closely identified with individuals, not the state.**

Unlike permanent monuments on government property or specialty plate designs, the letter and number combination on personalized plates are associated with individuals. Motorists understand that when they see a personalized plate on a vehicle, the vehicle owner has selected that particular combination. KYTC does not create or suggest specific alphanumeric combinations for customers on personalized plates. Ex. 2, 94:12–19. Currently, individuals seeking a personalized plate must complete an online form that asks, "Please describe what your plate personalization means." Ex. 22, Personalized License Plate Application.

Both the language of the statute and KYTC's practices establish that the selected messages are personal to the vehicle owner. *See, e.g.*, Ex. 5, 13:7–12; Ex. 23, Williams Dep. 19:11–20. Vehicle owners pick combinations that reference such topics as their names, initials, interests, jobs, anniversaries, birthdates, favorite sports team, among countless other subjects. *See, e.g.*, Ex. 1, 157:1–11; Ex. 24, 08/16/17 Noel Email. Such letter and number combinations are directly associated with individuals, not the state. In *Mitchell v. Md. Motor Vehicle Admin.,* Maryland's highest court explained the difference between the specialty plate designs at issue in *Walker,* and personal messages by owners: "Unlike the license plate slogans that States use 'to urge action, to promote tourism, and to tout local industries[,]' vanity plates are personal to the

9

vehicle owner, and are perceived as such." 450 Md. 282, 294 (2016) (quoting *Walker*, 135 S.Ct. at 2248). The court recognized that for personalized plates, this factor weighs strongly against a finding of government speech.

### iii. Vehicle owners largely control the messages on personalized plates, not the state.

In *Walker*, Texas maintained direct control over the designs it displayed on specialty plates. 135. S. Ct. at 2249. Texas' control of specialty plate design, however, was significantly more involved than Kentucky's involvement in the personalized plate program. For example, in some instances Texas was designing the specialty plates themselves. *Walker*, 135 S. Ct. at 2244. KYTC does not create or change personalized plate applications.

At the time that Mr. Hart's "IM GOD" plate was reviewed, the state liberally approved plate applications. Ainsley Snyder, who was in charge of reviewing license plates for many years, is not ever aware of the state changing a letter or number combination on a personalized plate without the consent of the customer, and could not recall denying or voting to deny a plate based on the subject matter if it was not covered in one of the applicable statutes. Ex. 1, 149:9–12; 162:15–19; *see also* Ex. 2, 100:11–25.

Looking at all three factors in total, and Kentucky's general practice, the messages on personalized license plates cannot reasonably be viewed as carrying the imprimatur of the government. For example, the state has approved E CIGS (meaning electronic cigarettes). Ex. 1, 161:14–25. During the same year that Mr. Hart's plate was denied, KYTC approved applications for: IMFAT, IMCRZ, DUMCAR, SPRDAD, and ZOMBEE. Ex. 25, 2016 Applications. It is doubtful that Kentucky has adopted these positions itself. KYTC also approved applications for a number of plates that appear to be contradictory: TOFAST and SLOW; 2GOFAS and SLOWVO; NOGAS and EATGAS; VEGAN and BBQ4U; and DROWSY and WAKEUP.

KYTC approved over 8,000 plate applications for personalized plates in 2016 alone. *Id.* As the Supreme Court recognized in *Matal,* if this speech is government speech, the government is "babbling prodigiously and incoherently." 137 S. Ct. 1744, 1758. The government would be saying "many unseemly things" and "expressing contradictory views." *Id.*

Because Kentucky does not exercise direct control over the alphanumeric selections by owners in the same way that governments do with their own monuments and plate designs, personalized license plates must be considered private speech. Indeed, the name itself – personalized plate – is the very indicia of the private nature of the speech.

### iv.   Most courts view personalized plates as private speech.

Some courts have considered whether personalized plates are private speech or government speech. In *Mitchell,* Maryland's highest court considered the *Summum* factors and determined personalized plates were unlike specialty plates and therefore were private speech. 450 Md. at 296. Similarly, the Eastern District of Michigan analyzed Michigan's personalized plates in light of *Summum* and determined that personalized plates were not government speech. *Matwyuk v. Johnson,* 22 F. Supp. 3d 812, 822–24 (E.D. Mich. 2014). Other courts also view personalized plates as private speech. *See, e.g.*, *Byrne v. Rutledge*, 623 F.3d 46 (2d Cir. 2010); *Morgan v. Martinez*, No. 14-CV-02468, 2015 WL 2233214 (D.N.J. May 12, 2015). Conversely, in *Comm'r of Indiana Bureau of Motor Vehicles v. Vawter,* 45 N.E.3d 1200 (Ind. 2015), the Indiana Supreme Court determined personalized plates were government speech. Any possible reliance on *Vawter* is misplaced as it is inconsistent with basic speech principles.

While license plates have "long been used for government purposes," the *Vawter* court neglected to give proper consideration to the nature of the speech in question. Plate *designs* have historically communicated on behalf of the government, but personalized plate alphanumeric

combinations have not. *See Mitchell,* 450 Md. at 294 (noting personalized plates have historically communicated owners' messages). Further, it is of little significance that the state prints the plate itself and may consider the plates government property. Private speech is routinely permitted on government property. *See, e.g.*, *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010).

The *Vawter* court also found that alphanumeric combinations on personalized plates are "often closely identified in the public mind with the [State]." 45 N.E.3d at 1205. It did so in part because personalized plates, like all license plates, are government IDs. The Maryland Supreme Court explicitly rejected the *Vawter* court, explaining that personalized license plates are unique and "[o]bservers of vanity plates understand reasonably that the messages come from vehicle owners," not the state. *Mitchell*, 450 Md. at 296. In this important way, personalized license plates are no different than a properly-permitted rally that takes place on government property, such as the State Capitol grounds. Under fundamental speech principles, Kentucky's personalized plates must be considered private speech.[6]

### B. Personalized license plates are subject to First Amendment scrutiny.

Because the speech at issue is private speech, First Amendment protections apply. In addressing First Amendment claims, the analysis begins by identifying the type of forum, which determines the applicable constitutional standard. *Matwyuk*, 22 F.Supp.3d at 824. The four types of forums recognized by the Supreme Court and the Sixth Circuit are: traditional public forum, designated public forum, limited public forum, and nonpublic forum. *Miller*, 622 F.3d at 534.

---

[6] Furthermore, should the Court accept Defendant's position that the personalized plates are government speech, the government would be precluded from approving religious plates because that would violate the Establishment Clause of the First Amendment. *Summum*, 555 U.S. at 468 ("government speech remains constrained by the Establishment Clause of the First Amendment.") The Supreme Court has further recognized that "[t]here is a crucial difference between . . . private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect," and "government speech endorsing religion, which the Establishment Clause forbids." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000).

Regardless of the type of forum, a speech restriction must be "reasonable and viewpoint-neutral." *Summum*, 555 U.S. at 470. Because KYTC's restriction on speech is neither reasonable nor viewpoint-neutral, it must fail regardless of whether the personalized license plate program is a limited public forum – opened by the government "to certain groups" or that is "dedicated solely to the discussion of certain subjects," *Id.* at 470 – or a nonpublic forum – where "the government is acting as a proprietor [over property not traditionally open to the public], managing its internal operations." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992). Viewpoint neutrality and reasonableness are baseline requirements in both limited and nonpublic fora. *Miller,* 622 F.3d at 536. Therefore, whether this Court finds the personalized license plate program to be a limited public or a nonpublic forum, the statutory scheme must still fail because it is not reasonable or viewpoint-neutral.

### C.  KRS 186.164 contains unreasonable impermissible viewpoint restrictions.

#### i.  A categorical ban on religious and political speech constitutes viewpoint discrimination.

KYTC has historically interpreted KRS 186.164 and KRS 186.174 as placing a near-ban on all personalized license plates that contain religious or political messages.[7] *See, e.g.,* Ex. 11; Ex. 1, 110:13 (deny plates with any "political reference"). A trio of Supreme Court cases strongly support the proposition that a blanket ban on all religious messages constitutes facial viewpoint discrimination. By operation of the reasoning in these cases, the same is true of bans on political messages.

First, in *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384 (1993), the Court held that a New York school district discriminated on the basis of viewpoint when it refused to allow a church use of their facilities to show videos about parenting "from a Christian

---

[7] Notwithstanding this interpretation, it is clear that a number of plates with religious reference were still approved. *See* Ex. 12 (list of "GOD" plates).

perspective." *Id.* at 389–90. The Court reasoned that the speech at issue – parenting and family values – would be otherwise permissible, but was excluded only because it "deal[t] with the subject matter from a religious standpoint," a "basis [that] was plainly invalid." *Id.* at 393–4.

In *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995), the Court addressed the University of Virginia's ("UVA") Student Activity Fund. UVA's policy excluded student groups from eligibility for these funds if the groups engaged in activity that "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality." *Id.* at 825. Applying *Lamb's Chapel*, the Court held that UVA's policy constituted impermissible viewpoint discrimination because "the University justifie[d] its denial of [funds] on the ground that the contents of [the magazine] reveal an avowed religious perspective." *Id.* at 832.

Finally, in *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) the Court held that a school district engaged in viewpoint discrimination by refusing to allow a Christian club to rent school facilities after school hours, while allowing the space to be used by non-religious community groups. The Court reaffirmed a broad view of religion-as-viewpoint, reasoning that the school policy already permitted groups renting at the school to teach "morals and character development to children" *Id.* at 108. Therefore, denying a religious group the opportunity to do the same from a Christian perspective would be to exclude "otherwise permissible subjects … on the ground that the subject is discussed from a religious viewpoint." *Id.* at 112.

1. **Kentucky's plate restriction on the basis that an individual seeks to promote "any specific faith, religion, or antireligion" is accordingly unconstitutional.**

Kentucky has interpreted KRS 186.164(9)(e)'s prohibition on messages that promote "any specific faith, religion, or antireligion" to mean, in essence, "nothing religious" allowed. Group Ex. 26, Panel Review Spreadsheets at 2, 4, 8, 17. This prohibition has been so broadly

construed as to not only bar any plate containing an "overt religious statement or an anti-religious statement," (Ex. 4, 73:22–23), but also any "religious reference" (*Id.* 112:1–10; Ex. 1, 135:3-10), anything "religious in nature," (*Id.* 121:18), any "reference to God or religious connotation" (Ex. 2, 50:3–5), anything with "religious meaning" (*Id.* 74:1–4), any "religious expression" (Ex. 4, 94:7–8), "religious term" (*Id.* 96:1), or "religious statement" (*Id.* 123:12–13). This overwrought prohibition excludes a massive amount of speech solely because it expresses a religious point of view on otherwise permissible subject matter.

Messages related to one's personal philosophy and belief are routinely accepted ("I AM JOY," "PURLUV," "IDREAM") as are statements of personal identity ("ATTRNY," "BOXRMOM," "KYEMT") and inspirational messages ("B LOVE," "B UNIQUE," "HOPE"). Kentucky's only stated justification for approving these messages and disapproving of messages such as "BLESD1," "GODSLV," "JSAVES," and "BELEVE" is that they speak from an avowed religious perspective. Group Ex. 27, Panel Review Spreadsheets at 2, 6, 9, 16. Because Kentucky allows speech on a wide range of subjects, but prohibits speech on those subjects if it comes from a religious viewpoint, the policy must fail as impermissible viewpoint discrimination.

The Second Circuit held as much in a case startlingly similar to this case. In *Byrne,* the court struck down Vermont's policy of rejecting personalized plates that "refer, in any language, to a ... religion or deity." 623 F.3d at 50. Vermont, like Kentucky, required applicants to state the particular alphanumerical combination that they desire, and also "state what [the] proposed combination represent[s]" to them." *Id.* at 51. Plates would be rejected for having religious content in either the facial or supplied meaning. *Id.* As here, this system bred absurd results. *Id.*

The Court held Vermont's categorical prohibition on religious messages amounted to viewpoint discrimination. *Id.* at 54–56. In so ruling, the Court rejected Vermont's argument that

the policy was viewpoint-neutral because it banned "all speech on religion whether positive, negative, or neutral." *Id.* at 58. The Court found that the "ban on all religious messages in a forum…otherwise broadly opened to comment on a wide variety of subjects, including personal philosophy, affiliation, and belief, serves not to restrict content but instead to discriminate against a specific premise, perspective, [and] standpoint, and, as such, is impermissible." *Id.* at 59. For the same reasons, Kentucky's policy discriminates based on viewpoint, and cannot stand.

Further, Kentucky's policy of relying on the applicant's supplied meaning of the text to approve or deny plates operates as a textbook example of viewpoint discrimination in practice. For instance, a license plate with the letters "B LOVE" was approved where the customer's provided explanation was "Hopefully, this will remind people to be kind and loving, not angry and hateful..." Ex. 28, Spreadsheet at 3; Ex. 2, 78–79. Yet, if the customer referenced God in the explanation of the text (for instance, saying "God is love and we should all be more loving like God"), the same plate text would be denied. *Id.*; *see also* Ex. 29 at 2 ("IAM2ND" explanation is "God is first in life"), Ex. 30, 8/21/17 Email Denying "IAM2ND." *Compare* Ex. 31 at 1 ("IAM2ND" approved when explanation is "My wife and kids are always first"). In relying on the applicant's supplied meaning, Kentucky "denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806. The discriminatory effect of the rule is clear.

## 2. Kentucky's restriction on the basis that an individual seeks to "promote a specific political belief" is unconstitutional.

Similarly, Kentucky has broadly interpreted KRS 186.164(9)(d)'s ban on political speech to prohibit a massive amount of speech. KYTC employees described the rule, variously, as a prohibition against plates containing: any "political reference" (Ex. 1, 110:13); "specific political belief" (Ex. 2, 81:22–23); "anything political" (*Id.* 82:13); or any message conveying "an

individual's *perspective* on any given issue being considered within the political domain" (Ex. 4, 107:12–13) (emphasis added). These definitions are so broad as to swallow a universe of otherwise permissible speech only because the requested message conveys a political perspective.

The absurd and viewpoint-discriminatory results seen in Kentucky's attempt to ban all religious speech are equally represented in its attempt to ban political speech. For example, a license plate request for the letters "BLUE" would be approved if the customer explained that they were a University of Kentucky basketball fan, but the same plate text would be denied if the customer stated that it signified that they identify as a Democrat. Ex. 1, 138–39. Once again, the speech at issue is apparently permissible speech in this forum. The only reason that Kentucky has offered for excluding this otherwise permissible speech is that the requestor has provided an avowed political perspective as the motivation. This result is viewpoint discrimination in both principle and practice.

### ii. Kentucky's restriction on religious and political speech is unreasonable.

The "reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in light of the purpose of the forum and all the surrounding circumstances." *United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 356 (6th Cir. 1998). The government must "articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018). Consequently, a speech regulation may be unreasonable if it lends itself to "haphazard interpretations" and wildly inconsistent enforcement. *Id.* at 1888–90.

Where a government speech restriction violates viewpoint neutrality, as here, a court "need not decide whether it is unreasonable in light of the purposes served by the forum." *Good*

17

*News Club,* 533 U.S. at 107. However, even if the Court were to find Kentucky's policy of excluding religious speech is viewpoint-neutral, there can be little doubt that the policy is unreasonable, as it is not germane to advancing Kentucky's own stated interests and cannot be applied consistently.

### 1. Kentucky's interpretation of the governing statutes is unreasonable because it does not support its stated purposes for the policy.

Kentucky claims that its ban on religious messages is reasonable in light of two compelling government interests: 1. "[To] avoid government association with ideas it would not want to be seen as promoting," an interest that "is significant given the Constitutional prohibitions on government establishment of religion," and 2. "[T]o promote highway safety and avoid potentially controversial messages that could lead to confrontation or distraction on its highways." [DN #14-1 at 13]. Neither reason stands up to scrutiny, as Kentucky's practice of rejecting plates based on either their plain meaning *or* supplied meaning significantly undercuts both of these stated goals.

As discussed in footnote 5, *supra*, if KYTC argues that government endorsement is implicit in accepted personalized plates, it opens itself up to a serious Establishment Clause violation. This would mean that Kentucky endorses the messages "SRVGOD," "PRAY4," "THXGOD," "YESGOD," and "U4GOD," among others. Ex. 12. Beyond this, however, Kentucky cannot claim that its first stated purpose justifies its denial of personalized plates that on their face have no explicit religious reference but contain a religious reference in the customer's provided explanation, because *no one* outside of KYTC will know that the plate contains a religious reference, other than the customer requesting it. Ex. 3, 40:11–20.

Similarly, Kentucky's second proffered purpose also fails to justify its impermissible application of the statutes, because Kentucky relies on a customer's explanation in denying plate

texts, even if the meaning of the plate is not at all clear to the average observer. Kentucky cannot justify its denial by invoking its claimed interest in avoiding "confrontation or distraction on the highways," because there is no way for other motorists to know the actual meaning of the plate. *See, e.g., United Food*, 163 F.3d at 357–358 (finding state agency's rejection of purported intimidating speech unreasonable because of lack of evidence to substantiate intimidation).

> ## 2.  Kentucky's interpretation of the governing statute is unreasonable because there is no articulated basis for the interpretation, and as such, it is inconsistently enforced.

Kentucky has never been able to "articulate some sensible basis for distinguishing what may come in from what must stay out," and its failure to do so is borne out by the results. *Minnesota Voters*, 138 S. Ct. at 1888. KYTC's application of the relevant statutes is overbroad, ill-defined, and subject to "haphazard interpretations." *Id.*

The *Minnesota Voters* case, in which the Supreme Court struck down Minnesota's law banning "political apparel" at polls, is instructive to the issue at hand here. In attempting to tease out specific examples of what "political apparel" would or would not be permissible, the court encountered the same absurd contradictions that we see here:

> A shirt declaring "All Lives Matter," we are told, could be "perceived" as political. How about a shirt bearing the name of the [NRA]? Definitely out. That said, a shirt displaying a rainbow flag could be worn "*unless* there was an issue on the ballot" that "related somehow ... to gay rights." A shirt simply displaying the text of the Second Amendment? Prohibited. But a shirt with the text of the First Amendment? "It would be allowed."

*Minnesota Voters*, 138 S. Ct. at 1891.

Kentucky has the same problem. Based on KYTC's record of refusals and approvals for personalized plates, it is virtually impossible to glean any consistent definition of what constitutes a "political" message. Kentucky has interpreted "political" in such a broad and ill-defined manner as to include references to: current events in a foreign country ("BREXIT"

denied, *see* Ex. 32 at 6; Ex. 33); references to guns ("GUNUP" denied, Ex. 34 at 6); single words with no obvious meaning out of context ("STAND" denied, Ex. 35; Ex. 36); and unpronounceable strings of characters ("I CCDW" denied, Ex. 37 at 4). "POTUS" is political (Ex. 32 at 4; Ex. 38) but not "G DUBYA," even though the applicant stated it was in reverence of former President George W. Bush (Ex. 39 at 6). Conversely, "TRUMP-1" *is* political (Ex. 40 at 5), yet oddly "MAGA45" is not (Ex. 27 at 12). Even such a generally acceptable and laudable statement as a desire to "Celebrat[e] Equality," by Kentucky's reading, constitutes a "specific political belief" such that the plate "EQUAL-T" was denied. Ex. 16; Ex. 41, 01/17/19 Noel Email.

Similarly, Kentucky's inconsistent application of KRS 186.164(9)(e)'s prohibition on religious speech has resulted in a number of haphazard interpretations that have constantly evolved over the last two and a half years. Such inconsistent enforcement now allows for plates declaring "SRVGOD," "PRAY4," "THXGOD," "YESGOD," and "U4GOD," but denies plates reading "1GOD" and "IM GOD." Ex. 15.

 "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity. But the State's difficulties with its restriction go beyond close calls on borderline or fanciful cases. And that is a serious matter..." *Minnesota Voters,* 138 S. Ct. at 1891. The same can be said of Kentucky. With such inconsistent interpretations and applications of the governing statutes, it is clear that Kentucky's prohibition on religious and political speech is unreasonable and therefore unconstitutional.

### D. <u>On its face, the "good taste and decency" regulation violates free speech because it is overbroad and confers unbridled discretion.</u>

The criteria for the recalling a plate under 601 KAR 9:012(5) run afoul of the prohibition against unbridled discretion. "[A]dministrators may not possess unfettered discretion to burden

or ban speech, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763–64 (1988). Boundless rules run the risk that the government will use seemingly innocuous standards in pretextual and censorial ways, "hiding the suppression from public scrutiny." *Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Co. Pub. Sch. Dist*., 457 F.3d 376, 386 (4th Cir. 2006). In particular, such a scheme may not delegate overly broad discretion to government officials. *Forsyth Cty., Ga. v. Nationalist Movement,* 505 U.S. 123, 130–31 (1992) (requiring "narrow, objective, and definite standards to guide the licensing authority"); *see also Thomas v. Chicago Park Dist.,* 534 U.S. 316, 323 (2002) (where unduly broad discretion is given, "there is a risk that [the government] will favor or disfavor speech based on its content").

Here, 601 KAR 9:012(5) lacks objective criteria, allowing Defendant to bar speech based on ambiguous, subjective, arbitrary, and discriminatory reasons. Defendant has reserved for itself the open-ended ability to recall any personalized plate on the basis that is "offensive to good taste and decency." The Supreme Court in *Shuttlesworth v. City of Birmingham* explained that "many decisions of this Court over the last 30 years, [have held] that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth,* 394 U.S. at 150–51.

Other overbroad personalized license plate schemes have faced similar legal challenges. *See Lewis v. Wilson*, 253 F.3d 1077, 1080 (8th Cir. 2001) (striking down Missouri regulation as providing unfettered discretion when state had authority to restrict plates bearing messages that are "contrary to public policy."); *Morgan*, 2015 WL 2233214, at *8 (finding that vehicle owner

21

seeking 8THEIST plate had stated a claim in facial challenge to New Jersey's "offensive to good taste and decency" plate regulation); *Matwyuk*, 22 F. Supp. at 824 (citing *Shuttlesworth,* 394 U.S. at 150–51 (1969)). Kentucky's "good taste and decency" regulation lacks the "narrow, objective, and definite standards," necessary for a licensing scheme and is therefore unconstitutional.

## II. Kentucky's Denial of Mr. Hart's License Plate is also an Unconstitutional Application of the Regulation and the Statute.

Not only is Kentucky's application of the statutes unconstitutional on its face, it is impermissibly viewpoint-discriminatory and unreasonable as applied to Mr. Hart's plate request, whether the personalized license plate program is considered a limited public or a nonpublic forum. In reviewing the facts underlying the denial of Mr. Hart's requested plate, this Court should determine whether there has been a disparate or uneven application favoring one viewpoint over another. *See, e.g., Phelps-Roper v. Ricketts,* 867 F.3d 883, 897 (8th Cir. 2017) (plaintiff must "establish a pattern of 'unlawful favoritism'"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 866 (7th Cir. 2006) (reviewing pattern of uneven application disfavoring plaintiff's viewpoint). Here, the review and rejection of Mr. Hart's speech was based on his viewpoint.

### A. Rejection under 601 KAR 9:012(5) discriminates based on viewpoint.

601 KAR 9:012(5) prohibits license plates that are "offensive to good taste and decency." KYTC informed Mr. Hart that his license application was denied because it violated this particular section. [DN #1-3]. KYTC further testified that the license plate was not in good taste because it was not appropriate to have such a conversation or engage in a debate about God on the highway. Ex. 5, 155:22–156:11. KYTC, however, does not apply that "standard" to all messages about God. Rather, it appears certain "positive" Christian messages are considered to be in good taste. For example, the license plate "SRVGOD," which also references God but

22

appears to be doing so in a manner that promotes a monotheistic religious belief, is considered in good taste by KYTC. Indeed, the Commissioner, along with the Governor's office, in August 2018 overruled the July 6, 2018, retraction of "SRVGOD," which was based, in part, on 601 KAR 9:012(5), apparently changing its mind that the customer's reference to God was in good taste. *Compare* Ex. 42, 08/06/18 Snyder Email, *with* Ex. 43, 06/27/18 Snyder Email. Similarly, each of the license plates referencing GOD in Ex. 12 is necessarily considered to be in good taste as none of those plates have been revoked pursuant to 601 KAR 9:012 despite needing to be renewed, and therefore reviewed, each year. These plates include "THX GOD," "MY GOD," "HES GOD," "IM4 GOD," "PRZ GOD," and "LUV GOD." *Id.*   Such a pattern of allowing certain references to a belief in a monotheistic God demonstrates an inconsistency in application, compared with the denial of Plaintiff's request. This uneven application is inconsistent with the First Amendment's requirement that the regulation not discriminate against Plaintiff's speech on the basis of viewpoint.

**B. Kentucky's application of KRS 186.164(9) also discriminated based on Plaintiff's viewpoint.**

The First Amendment prohibits Kentucky from selectively rejecting certain religious or non-religious messages. Based on the discovery shown, however, KYTC rejected Mr. Hart's religious message because it disagreed with his religious message. KRS 186.164(9)(e) precludes personalized plates that "have as its primary purpose the promotion of any specific faith, religion or antireligion." Defendant did not apply this restriction similarly to all references to religious, faith, or antireligious messages. KYTC's pattern of allowing certain religious messages demonstrates that its decision to reject Mr. Hart's plate is based on his specific viewpoint. Ex. 12. Indeed, the employee responsible for reviewing license plates at the time Mr. Hart applied for his plate recognized "there were a lot of other plates out on the road that – that had God or were

religious." Ex. 1, 172:20–21. This understanding informed her initial inclination to approve Mr. Hart's plate "from a fairness standpoint." *Id.* 173:2–3.

Nevertheless, KYTC ultimately rejected Mr. Hart's request on the basis that it violated 601 KAR 9:012(5) and KRS 186.164(9)(e) and "parts of (c)." Ex. 5, 153:1–10. Plaintiff's religious (or "anti-religious") message is no different from other personalized plates that reference religion, such as "PRAY4," "SRV GOD," and others. As Ms. Snyder noted, she was "not inclined to deny" the message. Ex. 19. The commissioner at the time, however, noted "I don't like it and would not have approved it." *Id.* at 2.[8] Moreover, at the time Mr. Hart applied for his plate, nonmanagement personnel were reviewing the plates, and were considering the religious messages "on a case-by-case basis … they would just use their own common sense of what would be religious or antireligious or not, from their own experiences and understanding." Ex. 5, 24:1–14. There were no internal guidelines to make certain the statute was being applied consistently. Indeed, the training "consisted of them being given the statute, and then they would be told here's the phrase, or here's the exception, and use your own understanding of what is religious and not religious to determine whether that is or not." *Id.* 25:2–6.  There were no other guidelines at the time. *Id.* 25:23–24 ("I'm not aware of anything other than the statute itself being the guideline.").  Without written guidelines or specific training, it is unsurprising that KYTC applied KRS 186.164(9) in an inconsistent manner. *See City of Lakewood*, 486 U.S. at 758.

## C. <u>Kentucky's purported reasons for denying Mr. Hart's plate are pretextual and unreasonable.</u>

Notwithstanding the evidence of such a pattern, KYTC has claimed – and likely will claim in response to this Motion – that Mr. Hart's plate was rejected for purported safety reasons. Defendant's reliance on this ever-changing excuse lacks any reasonable basis. Defendant

---

[8] The plate would have been approved were it not for another government employee, the Kenton County Clerk, who did not like the message either, and contacted the Cabinet to ask the Cabinet to reject the message. *Id.*at 3.

attempts to weaponize Mr. Hart's First Amendment speech by twisting his protected expressive goal of encouraging dialogue and discussion into a desire to intimidate and instigate violent behavior; KYTC bases this position on a phone conversation Mr. Hart had with Ms. Snyder. *See, e.g.,* Ex. 5, 134:4–12. This position is laughable given Ms. Snyder's only contemporaneous comment about that call was that she had an "insightful conversation" and that Mr. Hart told her "[i]t is not meant to offend. I would only like to start a dialogue with those that see the plate." Ex. 19 at 1.  Additionally, Mr. Hart maintained a license plate with the same text requested here, "IM GOD," for twelve years in Ohio (Ex. 17, 21:9–10), yet the evidentiary record is entirely void of there ever being *any* safety concerns regarding this plate among the motorists of Ohio.

Moreover, KYTC's claims of safety concerns is undermined by the fact that nothing in the statute precludes any driver from placing that message on a bumper sticker anywhere else on the vehicle. *See, e.g., Air Line Pilots Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1159 (7th Cir. 1995) ("the reasonableness of excluding political advertisements must be judged in light of the nature and purpose of the [forum]"). Restricting Mr. Hart's message on the license plate would not prevent the purported safety concerns given Defendant's concession that the same message could be placed anywhere else on the vehicle. Ex. 5, 206:25–207:12. Thus, this argument lacks any reasonable basis and is merely a pretext for discriminating against Mr. Hart's viewpoint.

## CONCLUSION

Kentucky's personalized license plate program unconstitutionally restricts speech, because it impermissibly and unreasonably restricts speech. Kentucky's denial of Mr. Hart's request similarly violated his First Amendment rights. For the reasons set forth above, the Court should grant summary judgment in favor of Plaintiff.

Respectfully submitted,

/s/ Corey M. Shapiro
Corey M. Shapiro
Heather L. Gatnarek
ACLU OF KENTUCKY FOUNDATION
325 W. Main Street, Suite 2210
Louisville, KY 40202
corey@aclu-ky.org
heather@aclu-ky.org

Patrick C. Elliott*
Colin E. McNamara**
FREEDOM FROM RELIGION FOUNDATION
10 N. Henry St.
Madison, WI 53703
patrick@ffrf.org
colin@ffrf.org
*Admitted Pro Hac Vice
**Pro Hac Vice motion pending

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on April 15, 2019, I filed this Motion for Summary Judgment with the Clerk

of the Court by using the CM/ECF system, which will send a notice of electronic filing to the

following:

Paul Kevin Moore
Kyle W. Ray
William H. Fogle
Kentucky Transportation Cabinet
Office of Legal Services
200 Mero Street
Frankfort, KY 40601
(502) 564-7650
kevin.moore@ky.gov
kyle.ray@ky.gov
william.fogle@ky.gov

*Counsel for Defendant*

/s/ Corey M. Shapiro
Corey M. Shapiro